

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00048-CR

**CLINTON TYNES,**

                                                    **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                    **Appellee**

**From the 19th District Court
McLennan County, Texas
Trial Court No. 2010-1272-C1**

## MEMORANDUM  OPINION

Appellant, Clinton Tynes, was charged by indictment with two counts of aggravated robbery, a first-degree felony. *See* TEX. PENAL CODE ANN. § 29.03(a)(1), (a)(3), (b) (West 2011). A jury convicted Tynes on both counts and assessed punishment at sixty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice with a $10,000 fine for each count. The trial court ordered the imposed sentences to run concurrently. In three issues, Tynes argues that: (1) the evidence is insufficient to support his conviction; (2) the trial court abused its discretion in

admitting the written statement of a witness, Adella Stanford; and (3) the evidence is insufficient to support the assessment of court-appointed attorney's fees because Tynes is indigent. We affirm as modified.

## I. BACKGROUND

This appeal pertains to an incident that transpired on the evening of December 21, 2009, at the home of Scott and Sheila Corbin. Sheila had just returned home with her husband, Scott, after picking up their daughter from the movie theater when she was approached by two men. Scott had already gone inside the house, and Sheila, a disabled woman who used a walker, had gone back to the car to retrieve her cell phone and debit card. The two men pulled her out of the car, pushed her down, and demanded money. One of the men had a knife in his hand, and the other had a gun. Sheila testified that she saw a third man, but it was hard to identify the males because it was dark and the assailants wore masks. Sheila informed the men that she did not have any money. The men then demanded that she give them her cell phone and her keys, which she did. Sheila tried to stand up using her walker. One of the men, who Sheila described as wearing a yellow-hooded sweatshirt, had a gun pointed at her head as she stood up. At this time, Scott came to the glass door to see what was taking Sheila so long. The man with the gun placed the gun to Sheila's back and pushed her up the steps towards the house. The third male was instructed to "go out front and keep watch" while the other two who had weapons entered the Corbins' house.

Upon entering the house, the men demanded that the Corbins give them their jewelry, money, and Sheila's purse. Sheila told the men that she only had $100 in her

account, and the man with the gun responded by hitting her on the head with the butt of the gun and saying, "Bitch, I'm going to clean your account out." The man with the gun later pushed Sheila to the ground. While on the ground, Sheila observed the second male, who had a knife in his hand and wore a black-hooded sweatshirt, assault Scott. Sheila described the situation as follows:

> The guy in the black hoody had my husband in the kitchen, just kept poking at him with a real cheap black-handled steak knife, just kept jabbing him in the face. My husband is, like, jumping around, you know. They kept saying, "Give me your money, give me your jewelry." My husband is telling him, "We don't have any money. We don't have any jewelry." I'm laying [sic] there on the floor, and I had on two gold chains and then two gold rings, and he bent down—the guy holding the gun on me bent down and ripped them off my neck, and apparently had dropped one—had dropped a necklace and half the chain. Then he ripped my rings off. Then the other guy kept, you know, insisting, "Where is your money, where is your jewelry?" They kept saying, "Where is your purse?" I told them it was back in the back bedroom. I'm laying [sic] there on the floor with a gun to my head. You know, I'm listening to all this commotion going on. They forced my husband back to the—one guy forced my husband back to the back bedroom, and then I don't know what all went on there, other than before they get to the hallway—my daughter is in the bathroom. My husband yells, you know, "Lock the door." I don't even think they knew she was there until he said that, and then they did try to force their way in, but they didn't get in.

Scott testified that, shortly after entering their house, the man in the yellow hoody hit him in the face with his gun when Scott said, "We don't have anything." As a result, Scott sustained lacerations to his head, which caused bleeding down his face.[1] Later, the man with the knife led Scott to a bedroom where they saw Sheila's purse. The assailant asked Scott, "What's that," and Scott "grabbed the purse and slung

---

[1] The State proffered photographs of both Sheila and Scott to document the injuries they sustained during the robbery. Sheila had a laceration on her head, which was bleeding, bruising to her neck from when one of the assailants ripped her necklaces off of her neck, and lacerations on her leg. Scott had several lacerations on his forehead, which caused substantial bleeding down the side of his face.

everything . . . to try to scatter the contents to make things harder on them." After doing that, the assailant hit Scott with his hand and ordered Scott give up his wallet. Scott complied, and he and the assailant traveled down the hallway of the house, passing a bathroom. Knowing that his daughter was in the bathroom, Scott instructed his daughter to lock the door. The assailant tried to break in to the bathroom, but he was unsuccessful.

Then, the assailant and Scott returned to the living room near where Sheila was lying. Scott recounted that he was hit on the head with a gun once again. Thereafter, the assailants threatened to kill the Corbins if they called the police, and subsequently left the house in the Corbins' car, a PT Cruiser, which had been already started by the third male who was keeping watch. As the assailants backed down the driveway in the Corbins' car, they hit a tree and drove through a portion of the Corbins' yard.

Police were immediately called to the scene. Statements were taken, and the Corbins were taken to the hospital for treatment. The Corbins' PT Cruiser was found less than half a mile away from the Corbins' house.[2] DNA tests were conducted on various parts of the vehicle, including the inside handle of the driver's-side car door and the steering wheel. Comparing the DNA obtained from the Corbin's vehicle with buccal swabs taken from Tynes, police found Tynes's DNA on the inside handle of the driver's-side door and on the steering wheel of the PT Cruiser. Both Scott and Sheila

---

[2] A photograph of the recovered PT Cruiser was admitted into evidence and revealed damage to the rear of the vehicle, which resembled damage that would be associated with hitting a tree.

testified that they did not know Tynes and that Tynes had never been a passenger in their car before that night.

Two days after the incident, police received a call from Adella Stanford regarding various items found in her trash can. Among the items found in Stanford's trash can was Sheila's wallet with her driver's license and social security card and a knife. DNA tests were conducted on the items found in Stanford's trash can. Scientists were unable to obtain sufficient DNA profiles from most of the items; however, Tynes's partial DNA profile was found on Sheila's wallet, and the knife contained the partial DNA profile of one of Tynes's associates—Cameron Harrison.

After recovering the items from her trash can, Stanford spoke with police. Officer Rondell Blatche' of the Waco Police Department testified, without objection, that Stanford identified three males that could have put the items in her trash can. Stanford told Officer Blatche' that Cameron Harrison, Trey Matthews, and "another boy . . . she knew as Clint" had been hanging around her house shortly after the robbery occurred and were acting suspiciously. Officer Blatche' then took a written statement from Stanford, wherein she stated the following:

> On 12/21/09 at auround [sic] 9:00 p.m. or later[,] Adella Stanford was at 3700 N. 22nd when three guys by the name of Cameron Harrison, Trey Mathews [sic], and Clint where [sic] in my front yard acting suspicious and I told them to get off of my property. They had on blue jeans with hoodies wich [sic] one that stood out was yellow. When they left[,] they went walking back towards [P]ark [L]ake Dr.

Officer Blatche' further testified that Stanford told him that one of the males that she saw that night was wearing a black hoody and another was wearing a yellow hoody.

According to Officer Blatche', Stanford's description of the males on her property that evening matched the descriptions provided by the Corbins. Stanford also indicated that she had seen Cameron, Trey, and Clint together many times and that their hanging out "wasn't nothing [sic] unusual." Stanford testified that she knew Cameron, Trey, and Clint because "[t]hey used to play with my boys, come to my house."

Tynes was subsequently indicted with two counts of aggravated robbery—one count pertaining to Scott and the other pertaining to Sheila. *See id.* § 29.03(a)(1), (a)(3). Tynes requested a court-appointed attorney, indicating that he was indigent. The trial court concluded that Tynes was indeed indigent and appointed him counsel. Tynes elected for a jury trial on guilt-innocence and punishment; trial commenced on February 15, 2011.

At the conclusion of the evidence, the jury convicted Tynes of the charged offenses and assessed punishment at sixty years' incarceration for each count. The trial court ordered the sentences to run concurrently and certified Tynes's right to appeal. This appeal followed.

## II. STANFORD'S WRITTEN STATEMENT

In his second issue, Tynes contends that the trial court abused its discretion in admitting Stanford's written statement because the probative value of the evidence was outweighed by its prejudicial effect. In particular, Tynes argues that the evidence "accomplished next to nothing that was legitimate, but it overly emphasized the importance of hoodies in an otherwise paper-thin case." The State counters that the trial court properly overruled Tynes's rule 403 objection. *See* TEX. R. EVID. 403. The

State also asserts that even if it was error to admit the evidence, such admission was harmless because the evidence was cumulative of other unobjected-to evidence.

At trial, Stanford initially refused to admit that she made a written statement to police. On appeal, the State characterizes Stanford as a "very uncooperative witness." Because she refused to admit to the truth of the statements made in her written statement to police, the State proffered her written statement for admission into evidence and for purposes of impeachment. The trial court admitted Stanford's written statement into evidence over Tynes's rule 403 objections. *See id.*

As noted above, Tynes argues on appeal that Stanford's written statement should not have been admitted because its probative value was outweighed by its prejudicial effect. We conclude that any error in the admission of Stanford's written statement was harmless because the same evidence was introduced without objection several times during the trial. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (holding that any error in the admission of hearsay testimony was harmless in light of other properly admitted evidence proving the same fact); *see also Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) ("'An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.'") (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). In fact, when impeached with her written statement, Stanford admitted, without objection, to the truth of the statements made in

the document.  Furthermore, Officer Blatche' testified, without objection, that he took Stanford's written statement and testified about the statements Stanford made to him, which mirrored the information contained in her written statement.

The court of criminal appeals has specifically stated that, for an issue pertaining to the admission of evidence to be preserved, a proper objection must be made "'each time the inadmissible evidence is offered or [appellant should] obtain a running objection.'" *Lane*, 151 S.W.3d at 193 (quoting *Valle*, 109 S.W.3d at 509).  Here, Tynes did not object to each time the alleged inadmissible evidence was offered, nor did he obtain a running objection.  Therefore, based on the foregoing, we cannot say that Tynes has demonstrated that the trial court abused its discretion in admitting Stanford's written statement into evidence.  *See Resendiz*, 112 S.W.3d at 546; *see also Moses*, 105 S.W.3d at 627.  We overrule his second issue.

### III.  SUFFICIENCY OF THE EVIDENCE

In his first issue, Tynes asserts that the evidence is insufficient to establish that he:  (1) threatened injury as a principal to the offense; (2) committed theft as a principal to the offense; (3) caused bodily injury as a principal to the offense; (4) used or possessed any weapon as a principal to the offense; (5) intended to be a party to any offense; or (6) solicited, encouraged, aided, or attempted to aid in the commission of the offense.

### A.  Standard of Review

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, No. AP-76,020, ___ S.W.3d ___, ___, 2011 Tex. Crim. App. LEXIS 1222, at **43-44 (Tex. Crim. App. Sept. 14, 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S. Ct. 2781, 2792-93, 61 L. Ed. 2d 560 (1979). Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

## B. Applicable Law

The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

As indicted in this case, a person is guilty of aggravated robbery if he "commits robbery" and "uses or exhibits a deadly weapon." TEX. PENAL CODE ANN. § 29.03(a)(2). A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02(a) (West 2011). A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a) (West Supp. 2011).

The jury charge also contained language pertaining to the law of the parties. A person commits the offense as a party if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011). In determining whether the evidence is sufficient to prove that a defendant participated as a party in

committing an offense, we look to "events before, during, and after the commission of the offense." *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006). If the evidence shows that the defendant was present at the scene and encouraged the commission of the offense by acts, words, or other agreement, the evidence is sufficient to convict under the law of the parties. *Wooden v. State*, 101 S.W.3d 542, 547-48 (Tex. App.—Fort Worth 2003, pet. ref'd). Further, evidence of flight from the scene and furtive behavior is indicative of guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007); *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

## C. Discussion

In the instant case, Tynes does not dispute that a robbery occurred. Instead, Tynes contends that the evidence does not demonstrate that he participated in the crime.

We find that the record contains sufficient evidence implicating Tynes's involvement in the robbery. Specifically, the record demonstrates that two men, one wearing a black-hooded sweatshirt and the other wearing a yellow-hooded sweatshirt, confronted and assaulted the Corbins while taking, among other things, jewelry, credit cards, Sheila's wallet, and the Corbins' PT Cruiser. During the commission of these acts, the men used a knife and a handgun—items identified at trial as deadly weapons. According to Sheila, a third male was instructed to remain outside the Corbins' house to serve as a lookout and as the getaway driver. After taking the property and assaulting the Corbins, the men got into the Corbins' PT Cruiser and drove away. However, shortly thereafter, the car was abandoned, and Stanford observed three males

congregating suspiciously on her property approximately fifteen minutes after the robbery transpired. Stanford recalled that one of the males was wearing a yellow-hooded sweatshirt and another was wearing a black-hooded sweatshirt—clothing that matched the Corbins' description of the clothing worn by the assailants. Stanford identified the three males as Tynes and two of his associates, Matthews and Harrison. Stanford was certain of their identities because the men were once friends of her children. Thereafter, Stanford discovered several items in her trash can. Among the items found were a knife that matched the description of the knife used in the commission of the robbery and Sheila's wallet, driver's license, and social security card. Police tested the items found in Stanford's trash can and discovered that Tynes's partial DNA profile was on Sheila's wallet, and the knife contained Harrison's partial DNA profile. The police also tested the abandoned PT Cruiser and discovered that Tynes's DNA was on the inside handle of the driver's-side door and on the steering wheel. Both Sheila and Scott denied knowing Tynes and testified that Tynes had never been a passenger or driver in their PT Cruiser prior to the night of the incident.

Nevertheless, Tynes contends that: (1) the stolen property found in Stanford's trash can could have been placed there by someone else; (2) there is no proof as to when Tynes's DNA was left inside the Corbins' PT Cruiser; and (3) the State "proved nothing more than presence." For several reasons, the evidence and governing case law undermine Tynes's arguments.

First, we note that it was not incumbent upon the State to exclude "every reasonable hypothesis other than guilt" for the evidence to be considered sufficient. *See*

*Geesa v. State*, 820 S.W.2d 154, 157-61 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000); *see also Lopez v. State*, 267 S.W.3d 85, 97-98 (Tex. App.—Corpus Christi 2008, no pet.) (citing *Harris v. State*, 133 S.W.3d 760, 763-65 (Tex. App.—Texarkana 2004, pet. ref'd); *Richardson v. State*, 973 S.W.2d 384, 387 (Tex. App.—Dallas 1998, no pet.) ("[T]he mere existence of an alternative reasonable hypothesis does not render the evidence . . . insufficient . . . . [E]ven when an appellant identifies an alternative reasonable hypothesis raised by the evidence, the standard of review remains the same."); *Orona v. State*, 836 S.W.2d 319, 322 (Tex. App.—Austin 1992, no pet.)). Second, no evidence was presented suggesting that someone else placed the Corbins' personal property in Stanford's trash can. Further, both Sheila and Scott testified that Tynes had never been inside their vehicle prior to the night of the incident; therefore, the jury was rational to infer that Tynes's DNA was left inside the PT Cruiser on the night of the incident. And finally, the knife found in Stanford's trash can which matched the description provided by the Corbins as the knife used in the robbery had Harrison's DNA on it, and Stanford observed: (1) Harrison, Matthews, and Tynes acting suspiciously on her property shortly after the incident; and (2) that two of the males were wearing hooded sweatshirts that matched the assailants' clothing descriptions provided by the Corbins.

Looking as we must to the events before, during, and after the incident, we conclude that the jury was rational in determining that an aggravated robbery had been committed and that Tynes was either one of the assailants who entered the Corbins'

house or the lookout and driver. *See* TEX. PENAL CODE ANN. §§ 29.02(a), 29.03(a)(2), 31.03(a); *see also Clayton*, 235 S.W.3d at 780; *Powell*, 194 S.W.3d at 507; *Guevara*, 152 S.W.3d at 50; *Wooden*, 101 S.W.3d at 547-48. As such, we further conclude that the State proved that Tynes was more than merely present at or near the scene of the crime and that Tynes actively solicited, encouraged, directed, aided, or attempted to aid others in the commission of the robbery. *See* TEX. PENAL CODE ANN. § 7.02(a)(2). Accordingly, we affirm Tynes's conviction under the law of the parties. *See id.*; *see also Powell*, 194 S.W.3d at 507; *Wooden*, 101 S.W.3d at 547-48. Tynes's first issue is overruled.

## IV.    COURT-APPOINTED ATTORNEY'S FEES

In his third issue, Tynes complains that there is insufficient evidence to support the trial court's assessment of court-appointed attorney's and investigator's fees. Specifically, Tynes argues that because he was determined to be indigent before trial, the trial court improperly ordered him to pay $3,427.50 in court costs, which included attorney's fees in the amount of $2,998.50.

For the purposes of assessing attorney's fees, once an accused is found to be indigent, he is presumed to remain so throughout the proceedings absent proof of a material change in his circumstances. *See* TEX. CODE CRIM. PROC. ANN. art. 26.04(p) (West Supp. 2011); *see also Mayer v. State*, No. 10-10-00302-CR, 2011 Tex. App. LEXIS 1369, at *6 (Tex. App.—Waco Feb. 23, 2011, pet. ref'd) (mem. op., not designated for publication). Furthermore, the record must reflect some factual basis to support the determination that Tynes was capable of paying all or some of his attorney's fees at the time of the judgment. *See* TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2011);

*Barrera v. State*, 291 S.W.3d 515, 518 (Tex. App.—Amarillo 2009, no pet.); *see also Stevenson v. State*, No. 10-09-00358-CR, 2011 Tex. App. LEXIS 8302, at *3 (Tex. App.—Waco Oct. 19, 2011, no pet. h.) (mem. op., not designated for publication).

Here, the State concedes that there is insufficient evidence in the record to support the assessment of court-appointed attorney's and investigator's fees against Tynes. In such cases, the proper remedy is to reform the judgment by deleting the attorney's fees and investigator's fees. *See Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010); *see also Cain v. State*, No. 10-11-00045-CR, 2011 Tex. App. LEXIS 8159, at *11 (Tex. App.—Waco Oct. 12, 2011, no pet. h.) (mem. op., not designated for publication) (modifying the judgment to delete the finding ordering appellant to pay his court-appointed attorney's and investigator's fees). We therefore sustain Tynes's third issue and modify the judgment to delete the finding that orders Tynes to pay his court-appointed attorney's and investigator's fees.

## V.    CONCLUSION

We modify the trial court's judgment to delete the finding that orders Tynes to pay his court-appointed attorney's and investigator's fees. We affirm the judgment as modified.

AL SCOGGINS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed as modified
Opinion delivered and filed December 14, 2011
Do not publish
[CR25]